## Case No. 3,113.

### CONNER et al. v. The COOSA.

[Newb. 393.][2]

District Court, E. D. Louisiana. Dec., 1846.

PRIZE—VIOLATION OF BLOCKADE—PRACTICE.

1. If, upon the return of the monition. no person appears to assert a claim to the vessel and cargo, the proctor of the captors may move for a decree upon the evidence as it appears on the record.

2. A violation of a blockade, rigorously enforced, is a good ground for the seizure and condemnation of both vessel and cargo.

3. To constitute a violation of blockade, three things must be proved: 1st, the existence of the blockade; 2d, the knowledge of the party supposed to have offended; and 3d, some act of violation. either by going in or coming out with a cargo laden after the commencement of the blockade.

4. One of the immediate consequences of the commencement of hostilities is the interdiction of all commercial intercourse between the citizens of the states at war, with the license of their respective governments.

5. The law of prize is a part of the law of nations. By it a hostile character is attached to trade. independent of the character of the trader who pursues or directs it; and condemna-

[1] [Reported by Hon. William Cranch, Chief Judge.]
[2] [Reported by John S. Newberry, Esq.]

tion to the captors is equally the fate of the enemy's property and of that found engaged in an anti-neutral trade.

6. If the claimant be a citizen or an ally, at the same time that he makes out his interest, he confesses the commission of an offence, which, under a well known rule of the civil law, deprives him of a right to prosecute his claim. Ex turpi causa, non oritur actio.

[In admiralty. Proceeding by Commodore David Conner and others to condemn the bark Coosa as prize.]

C. A. Stewart and Thomas A. Clarke, for captors.

T. J. Durant, Dist. Atty., for the United States.

McCALEB, District Judge. The monition in this case has been returned. and no person having appeared to claim either the vessel or cargo, the proctor for the captors has moved for a decree of condemnation upon the facts as they appear upon the record. In granting that motion it is proper that those facts should be briefly detailed. On the 3d of October last, the vessel seized in this case cleared for the port of Havana and left this port under the command of Captain Hinckling. Instead of proceeding to the port of destination she steered for the coast of Mexico. According to the evidence of the mate given in answer to the standing interrogatories, "she sailed 1or no port or place before she was taken, except that she anchored five miles off the bar of Alvarado, where she lost her anchor. Her last voyage began at New Orleans and deponent expected it to end at Havana, but cannot say where it would have ended. He thinks the vessel is insured in New Orleans for the voyage on which she was taken, that is, from New Orleans to Havana. He thinks so, from the fact that the captain and himself had some difficulty about the manner in which the log-book was kept, and it seemed to be the object of the captain to have it kept in a way to save the insurance. He knows not to what place the Coosa was destined by her papers; he thought when he joined her, that she was going to Havana. To the best of his recollection (without seeing the log-book) the winds were favorable to a voyage to Havana without making a tack. The course of the Coosa was not at all times directed to Havana. If she was destined by her papers to that port, she did, before taken, steer wide of the port to which she was destined; but at the time she was taken, she was steering a course towards Havana from where she was then. She was then, as far as he can guess, five or six hundred miles from Havana. He knows not for what reason her course was altered from the course to Havana. He was told by the captain that they were destined for Havana, and it was never hinted to him that they were to go elsewhere until about twenty-four or thirty hours out from the Balize, he remarked to Captain

Hinckling that they seemed to be steering "pretty well south for Havana;" to which the captain replied, "I don't know, perhaps we may hit Mexico." From the evidence of this witness, it appears that the vessel sailed under American colors, but that she had on board English colors. This fact is also established by the testimony of Purdy, who further states that she hoisted English colors off Alvarado bar, and also a flag of truce. The captain when interrogated on this point, declared that there were no colors except American colors on board; but that there were one or two signals. This captain, whose fraudulent conduct is conclusively established by the evidence, declares that the vessel "sailed to no port after leaving New Orleans on the voyage on which she was taken;" that "at the time of being pursued and taken, she was steering off shore to get an offing. She was steering for no particular port or place at the time, but was bound for Havana." He declares that Mr. Fairweather of this city, is the owner of the vessel, as appears by the registry, and that Wylie & Egana were the shippers of the cargo. He says that the only papers delivered from the vessel after she left New Orleans, was a package of newspapers which was delivered to some fishermen off the Alvarado river about the 14th of October last; while the witness Brown declares that Captain Hinckling delivered several letters, four or five in number, to a person who came from shore to the Coosa while she was at anchor off Alvarado bar. The witness Purdy says that some of the men sold some tobacco off Alvarado. There are two letters in evidence signed by one Louis Diaz and dated at Vera Cruz on the 21st and 26th of October last. The one bearing date the 21st of October is addressed to Captain Hinckling, and is as follows: "By letters from New Orleans which have been addressed to me by Messrs. Wylie & Egana, merchants of said city, I have learned that you had sailed in the bark Coosa destined for Havana; and having been informed that the vessels of the United States squadron had met you on this coast and compelled you to drop anchor at Anton Lizardo, I have arranged to send you this letter by a fishing boat, in order that you should, in answer, state the cause of your detention, and be left to proceed with your vessel to the place of destination designated by the interested parties. If permitted by Commodore Conner to write, I will thank you, without losing a moment, to inform me of all that has occurred in relation to the detention of your vessel, in order to communicate the facts to Messrs. Wylie & Egana."

The letter under date of the 26th of October, is addressed to Commodore Conner. In it the writer says: "I am the consignee of the bark Coosa, which was boarded on the 17th of this month five miles from Alvarado bar, and taken to your station, where she is detained. It is my duty, on behalf of the

interested parties, to declare to you that said vessel carried nothing but cotton from New Orleans, which cotton was to be introduced into this country in virtue of a permit granted by the government in the month of January last, without payment of duties. It has been said that the bark carried warlike weapons. This is a chimera which can easily be destroyed by merely observing that the cargo occupies the entire hold and deck, leaving no room for another bale; and consequently I think that any slight suspicions of such a nature will at once be disregarded. The existence of the blockade cannot, I think, be with a view to prohibit the commerce of the United States with this country, but on the contrary, it should favor it, inasmuch as it can be carried on with the products of said nation (the United States) and in her vessels. Under this impression the parties interested have acted in relation to the Coosa. These parties trade almost exclusively in American produce and manufactures, and have now several vessels in the Mexican gulf and the Pacific, with which they carry on speculations which benefit the United States; which circumstance induces them to claim protection in their undertakings. If these reasons, and others which I cannot confide to paper, are entitled to your consideration, I beg you will order that the bark Coosa be immediately released, so that she may proceed to the destination which suits the parties interested; and also that Captain Hinckling be permitted to hold communication with me to receive my instructions."

A letter from Commodore Perry to Commodore Conner, referred to in the deposition of Mr. Rodgers, the prize master, shows clearly that the Coosa was discovered on the morning of the 17th of October off the bar of Alvarado, "evidently endeavoring to pass into the river." From this letter it also appears that Captain Hinckling acknowledged that he had communicated with the enemy by receiving a pilot on board. The master declares that the reason he altered the course of the vessel was, that after getting out, or rather while going out of the Southwest pass, he heard from a steamboat of the victory of Gen. Taylor at Monterey, and as the cargo was consigned "to order," he thought it best to go to the Mexican coast, as in consequence of the victory he was in hopes the blockade would be raised or would cease, and that he would be permitted to land the cargo. For these reasons he took it upon himself to sail for the coast of Mexico. This story, if true, could not save the vessel from condemnation; but when I consider it in connection with the testimony of other witnesses examined, I am compelled to regard it as extremely improbable. The information received from the steamboat, which had the effect of inducing the master to assume the responsibility of changing the course of the vessel from Havana to the coast of Mexico, was, it seems, never communicated even to the first mate, who declares that it was never hinted that the destination of the vessel was to any other port than Havana, until they were out from the Balize from twenty-four to thirty hours, when, in reply to a remark made by himself that they seemed to be steering "pretty well south for Havana," the master said, "I don't know, perhaps we may hit Mexico."

After an attentive consideration of all the evidence, I am satisfied that the vessel was not cleared at this port with any serious design of sending her to Havana; but on the contrary, that she sailed with the intention of proceeding to some port in Mexico. The letters of Diaz, whose effrontery is only equaled by his ignorance of the subject upon which he assumes the privilege of enlightening the mind of the commander of the American squadron, show clearly that the master in going to a Mexican port, was acting in accordance with the instructions, and executing the wishes and intentions of the shippers of the cargo. The nominal clearance of the vessel for the port of Havana was a scheme to elude the vigilance of the officers of the customs; and I regret to say that there is no feature in the transaction which entitles the parties concerned to the favorable consideration of the court. The vessel and cargo are equally implicated in the fraud, and must share the same fate.

There are two grounds upon which condemnation must be decreed. First, there had been a violation of the blockade now rigorously enforced by the American squadron against the ports of Mexico. To constitute a violation of blockade three things must be proven: 1st, the existence of the blockade; 2d, the knowledge of the party supposed to have offended; and 3d, some act of violation, either by going in or coming out with a cargo laden after the commencement of blockade. The Betsey, 1 C. Rob. Adm. 93. The existence of the blockade of the ports of Vera Cruz and Alvarado is a matter of public notoriety, and the declarations of the master show that he was aware of it. The letter of Commodore Perry shows that the vessel was taken in delicto. It was, moreover, clearly the intention of the parties concerned, to send the vessel to a port of Mexico; and the act of sailing to a blockaded port with a knowledge of the blockade, is a violation of that blockade, and works a condemnation of the vessel. These well settled principles of the laws of war I had occasion to consider in the case of The Nayade [Case No. 10,060].

The second ground upon which condemnation must be decreed is, that there has been a trading with the enemy. One of the immediate consequences of the commencement of hostilities, is the interdiction of all commercial intercourse between the subjects of the states at war, without the license of their respective governments. In Sir William Scott's judgment in the case of The

Hoop [1 C. Rob. Adm. 196], this is stated to be a principle of universal law, and not peculiar to the maritime jurisprudence of England. It is laid down by Bynkershoek as a universal principle of law. "There can be no doubt," says that writer, "that from the nature of war itself, all commercial intercourse ceases between enemies. Although there be no special interdiction of such intercourse as is often the case, commerce is forbidden by the mere operation of the law of war." Quaest. Jur. Pub. lib. 1, c. 3. In the case of The Hoop, Sir William Scott declared that "no principle ought to be held more sacred than that this intercourse cannot subsist on any other footing than that of the direct permission of the state. Who can be insensible to the consequences that might follow, if every person in time of war had a right to carry on commercial intercourse with the enemy, and under color of that, had the means of carrying on any other species of intercourse he might think fit?" Again; in the same case he says: "Another principle of law of a less politic nature, but equally general in its reception and direct in its application, forbids this sort of communication, as fundamentally inconsistent with the relation existing between the two belligerent countries; and that is, the total inability to sustain any contract by an appeal to the tribunals of the one country on the part of the subjects of the other. In the law of almost every country, the character of alien enemy carries with it a disability to sue, or to sustain, in the language of the civilians, a persona standi in judicio. A state in which contracts cannot be enforced cannot be a state of legal commerce. If the parties who are to contract have no right to compel the performance of the contract, nor even to appear in a court of justice for that purpose, can there be a stronger proof that the law imposes a legal inability to contract? To such transactions it gives no sanction—they have no legal existence; and the whole of such commerce is attempted without its protection, and against its authority." The same principles were applied by the American courts, and especially by the supreme court of the United States, to the intercourse of our citizens with the enemy on the breaking out of the late war with Great Britain. In the case of The Rapid, 8 Cranch [12 U. S.] 155, the supreme court determined, that whatever relaxation of the strict rights of war the more mitigated and mild practice of modern times might have established, there had been none on this subject. The universal sense of nations had acknowledged the demoralizing effects which would result from the admission of individual intercourse between the states at war. "The whole nation," says Mr. Justice Johnson, who delivered the opinion of the court, "are embarked in one common bottom, and must be reconciled to one common fate. Every individual of the one nation must acknowledge every

individual of the other nation as his own enemy—because the enemy of his country. This being the duty of the citizen, what is the consequence of a breach of that duty? The law of prize is a part of the law of nations. By it a hostile character is attached to trade, independent of the character of the trader who pursues or directs it. Condemnation to the captors is equally the fate of the enemy's property, and of that found engaged in an anti-neutral trade. If the claimant be a citizen or an ally, at the same time that he makes out his interest, he confesses the commission of an offence, which under a well known rule of the civil law, deprives him of his right to prosecute his claim." In this case it has been satisfactorily shown that the vessel not only left this port with the intention of landing her cargo at some port in Mexico, but that there was also an actual communication with the enemy, by the reception of a pilot on board and the delivery of letters and papers to a person who boarded the vessel from the shore while she lay at anchor off the bar of Alvarado.

For the reasons here given I shall condemn both vessel and cargo as prize of war to the captors.